IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

GAYNELL BLALOCK,                    )
                                   )
        Plaintiff,                 )
                                   )
vs.                                )        Case No.:    CV 00-P-2668-NE
                                   )
                                   )
WASTE INDUSTRIES, INC.,            )
                                   )
        Defendant.                 )

## MEMORANDUM OPINION

This case is before the court on Defendant's Motion for Summary Judgment (Doc. #50) filed

March 14, 2003.  As discussed below, Defendant's motion is due to be granted in part and denied

in part.  Defendant, Waste Industries, Inc. ("Waste Industries") is entitled to summary judgment on

Plaintiff's disparate impact claim.  However, there are disputed issues of material fact in this case

that preclude summary judgment on Plaintiff's disparate treatment claim.

## I.    STATEMENT OF FACTS

Viewing the evidence in the light most favorable to the non-moving party, resolving disputed

issues of fact in favor of the non-moving party, and drawing all reasonable inferences in favor of the

non-moving party, the record evidence is as follows.[1]

### A.    Waste Industries

Waste Industries is headquartered in Raleigh, North Carolina, and is primarily in the business

of "collecting and hauling municipal solid waste from businesses and homes." (Exh. I, Shaw Depo.

---

[1]Citations to the record such as "Exh. I" correspond to the numbered exhibit contained in Plaintiff's evidentiary
submission. (Doc. #60.)



at 17.)[2]

In May of 1997, Waste Industries acquired from Waste Management two branches located in Ooltewah, Tennessee, and Stevenson, Alabama. (*Id.* at 33-34.) In connection with this acquisition, Waste Industries established the "Tennessee Valley Region" comprised of the Ooltewah and Stevenson branches. (*Id.*) A branch in Dalton, Georgia was later added to the Tennessee Valley Region. (*Id.* at 49.)

### 1. Branch Management

With a few exceptions irrelevant to the motion for summary judgment, each branch has a branch manager responsible for overseeing daily operations. (Exh. I, Shaw Depo. at 25; Exh. J, Lowry Depo.[3] at 46; Exh. M, Depo. Exh. 2 (Branch Manager Job Description).) In some instances one branch manager will oversee other branches that do not have on-site branch managers. (Exh. I, Shaw Depo. at 49.) Such was the case at the Ooltewah branch during the timeframe relevant to this action; the Ooltewah branch manager was also responsible for the branches in Stevenson, Alabama, and Dalton, Georgia. (*Id.*) Within the branch, the supervising chain of command under the branch manager consists of an operations manager, maintenance manager, sales manager, and/or office manager. (Exh. J, Lowry Depo. at 46-47.)

---

[2]Steven Shaw became employed with Waste Industries in 1985 as the Corporate Controller. (Exh. E, Shaw Depo. at 13.) In 1999, Shaw became the CFO for Waste Industries. (*Id.* at 14.) Waste Industries designated Shaw under Rule 30(b)(6) to address topics regarding the Defendant's corporate structure and organization, as well as federal contracts maintained by Waste Industries. (*Id.* at 12 & Depo. Exh. 1.)

[3]Joe Lowry is the Human Resource Manager for Waste Industries and his office is located at the corporate headquarters in Raleigh, North Carolina. (Lowry Depo. at 23, 26-27.) Lowry was designated as a corporate representative under Rule 30(b)(6) to address topics generally relating to the Defendant's workforce, human resource functions, selection procedures for truck drivers, and aspects of implementation of the Defendant's affirmative action program. (Lowry Depo. at 9-12; Rule 30(B)(6) Depo. Exh. 1 (Notice of Deposition).)

Bud Emmer, the operations manager at the Ooltewah branch, testified that, although he could make hiring recommendations and screen out applicants without being reviewed by his superiors, it was the branch manager who made the ultimate decision as to who would be hired.  (Exh. N, Emmer Depo. at 25-29.)

### 2.    Corporate Human Resources

The Corporate Human Resources Department ("Corporate HR") is responsible for performing human resource functions for the entire company, including all regions (now called divisions) and branches.  None of the branches have an on-site human resources representative.  Rather, all human resources issues are handled by Corporate HR.  Joe Lowry became the Human Resource Manager for Waste Industries in 1995.  (Exh. J, Lowry Depo. at 26.)  Lowry's four main areas of responsibilities can be grouped under employee relations, management development, benefits and affirmative action.  (*Id.* at 41-43.)

Corporate HR formulated policies that applied to all branches, regardless of location.  For example, Waste Industries has a single Employee Handbook that is distributed to employees company wide.  (Exh. M, Depo. Exh. 7 (Employee Handbook).)  The Employee Handbook contains certain policies governing employment with Waste Industries that all branch managers must enforce and to which all employees must adhere.[4]  (*See* Exh. M, Depo. Exh. 2 (Branch Manger Job Description) (requiring branch managers to enforce all corporate policies and procedures).)  Moreover, the handbook also contains instructions directed to the Branch Manager regarding

---

[4]Due to the rapid growth of the company, Corporate HR developed a Human Resource Policy and Procedures Manual, so that the new branches would have a guideline as to the procedures to be followed regarding employment-related matters.  (Exh. J., Lowry Depo. at 78; Exh. M, Depo. Exh. 3 (HR Policy and Procedures Manual).)  The manual is currently being disseminated to the field and training is being provided to division and branch management.  When the training is complete, the manual will go into effect.  (Exh. J, Lowry Depo. at 79.)

implementation of certain policies.  (*Id.* at 32.)

### 3.    Development of Job Descriptions and Selection Criteria

Lowry testified that Waste Industries Corporate HR is responsible for formulating job descriptions and for establishing the criteria for each job.  (Exh. J, Lowry Depo. at 47-48, 71-73, 182-184.)  Waste Industries distributes a handbook to each division, which contains all of the company's job titles and job descriptions.  (*Id.* at 47-48, 71-73.)

Lowry testified that, when developing job descriptions, he receives input from the division and branch managers, but Corporate HR is the final authority and sets the criteria and qualifications to be utilized for each job.  (Exh. J, Lowry Depo. at 175-176.)  In responding to a request for information from the EEOC during its investigation of the Plaintiff's EEOC charge, the Defendant submitted a job description for Residential Driver dated March 21, 1996, which contained the following qualification criteria:

> **Education, Training, Experience and Licensing/Certification Requirements:**
> High School diploma or GED; or one to three months related experience and /or training or equivalent combination of education and experience.  demonstrate ability to follow written instructions and properly complete designated reports, records, etc. Must possess a valid Commercial Drivers License (Class A or B).  Must have a clean driving record.
> Must pass a DOT physical including drug screen.
> Good physical health and physical capability to perform all aspects of the job.
>
> **Physical/Mental Demands:**
>
>                 \* \* \*
>
> Must be able to regularly lift and/or move up to 10 pounds, frequently lift and /or move up to 25 pounds, and occasionally lift and/or move up to 50 pounds.
>
>                 \* \* \*

(Exh. O (Defendant's EEOC Responses).)

4

During Lowry's deposition, Defendant's counsel offered another job description for Residential Driver dated June 23, 1999, three years later than the first proffered description, which contained the same education, training, and experience criteria, except that the reference to "Good physical health and physical capability to perform all aspects of the job" was deleted and a reference to being subject to random drug screens was added. (Exh. M, Depo. Exh. 8.) Lowry testified that the job description for Residential Driver applied across the company regardless of branch location and the qualifications set by Corporate HR as reflected in the job description were to be followed by the branches:

| | |
|---|---|
| Q. | And there is criteria in this job description [referring to Exhibit 8] for qualifications that a truck driver must have to be hired? |
| A. | Yes, sir.  Yes, sir, it is. |
| Q. | And does the branch manager have the discretion to ignore the criteria that's in this job description? |
| A. | No, sir, he does not. |

(Exh. J, Lowry Depo. at 176.)

### 4.    Hiring Guidelines

In response to the EEOC's investigation, the Defendant described the application process at Waste Industries as follows:

1) Human Resources is informed of the vacancy or creation of the new position. The manager completes a Vacancy Response Form;

2) The employment vacancy is posted with the Alabama State Employment Service (provided the position is not being filled internally), and the local newspaper.  Employees are encouraged to make applicant referrals;

3) Interested parties will come to the Branch site/office to complete an application for employment and/or submit a resume;

4) All applications and resumes are forwarded to the hiring manager;

5

5)     The hiring manager screens the applications and/or resumes for a match with the job requirements;

6)     A viable applicant match is contacted for a face-to-face interview by the hiring management; and

7)     Applicable tests including a drug test, where required, are administered.

(Exh. O (Defendant's Response to the EEOC, Letter dated June 21, 2000).)   Although hiring guidelines for branch managers were not in writing prior to the Human Resource Policy and Procedures Manual implemented in 2000, Plaintiff has presented evidence suggesting that the steps set forth above, in effect before the manual was put in writing, are similar to the written procedure contained in the 2000 Manual. (*Compare* Exh. O (Defendant's Response to the EEOC, Letter dated June 21, 2000) *with* Exh. M, Depo. Exh. 3 at 5.)

Emmer, the Operations Manager at the Ooltewah branch, testified that, in addition to the requirements contained in the 1996 and 1999 job descriptions for Residential Driver, he added the requirement that an applicant must be able to lift 100 pounds. (Exh. N, Emmer Depo. 45. (When asked who told him that being able to lift a hundred pounds was a requirement for the driver position, Emmer replied "I set it.").)   Regarding the 100-pound lifting requirement, Emmer also testified:

Q.     Did Mr. Chilton have any say in whether [the 100-pound lifting requirement] was a qualification?
A.     Not to my knowledge, no.
Q.     Did you have that hundred pound lifting requirement approved by the corporate headquarters?
A.     No.
Q.     How did you know if an individual applying for a driver position could lift a hundred pounds?
A.     For the most part you could tell by looking at someone, and also they took a physical.
Q.     Was part of that physical lifting a hundred pounds?

6

A.  I don't think so, no.  I don't think they lifted a hundred pounds in the physical, no.

Q.  What would somebody look like that could lift a hundred pounds?

A.  I wouldn't know.

* * *

Q.  . . . You said that you could tell who could lift a hundred pounds by looking at them.

A.  I don't believe someone weighing 90 pounds could lift up a hundred pounds, no.

Q.  What about somebody withing 120 pounds?

A.  That's a possibility, yes.

Q.  But you didn't have anyone do a – lift a hundred pounds for you as part of the interview process?

A.  No.

(Exh. N, Emmer Depo. at 46-47.)

**B.    Blalock's Factual Allegations**

Plaintiff, Gaynell Blalock, received her CDL, Class B, in September 1999. (Exh. A, Blalock Depo. at 17-18, 26, 34-41.)   On or about October 11, 1999, she called the Stevenson branch of Waste Industries to inquire whether any positions were being filled. (Exh. A, Blalock Depo. at 115.) She went to the branch to pick up an application, which took about forty-five minutes because Kristie Cagle, a former clerical employee for Waste Industries, had to have an application faxed from the Ooltewah office as the Stevenson facility was out of applications. (Exh. A, Blalock Depo. at 116; Exh. H, Cagle Depo. at 19.)  Blalock took the application home to fill it out.  (Exh. A, Blalock Depo. at 119.)  That evening Blalock spoke with Bud Emmer by telephone telling him she planned to submit her application the following day. (*Id.* at 122-23; Exh. N, Emmer Depo. at 62-63.) The following day Blalock submitted her application to Linda Guess, the office manager at the Stevenson Branch. (Exh. A, Blalock Depo. at 124.)  Blalock asked Guess if they were hiring, to which Guess responded that there were two truck driver positions open. (Exh. A, Blalock Depo. at 124.)

7

The reason given to the EEOC by Waste Industries for not hiring Blalock is that she did not turn in an application.  (Exh. M, Depo. Exh. 5 (Letter to EEOC dated April 27, 2000).)  In his deposition, Emmer denied ever seeing Blalock's application or knowing that she turned in an application. (Exh. N, Emmer Depo. at 64.)  In Guess's affidavit submitted by Waste Industries, she acknowledges that Blalock did indeed submit to her an application for employment. (Exh. R, Def.'s MSJ- Guess Aff. p.3).

Kristie Cagle also testified that Ms. Blalock did, in fact, turn in the completed application. (Exh. H, Cagle Depo. at 24-25.)  Cagle further testified that she believed that Emmer was aware that Blalock had submitted an application:

> Q.   So Mr. Emmer knew she wanted to work at Waste Industries?
> * * *
>
> A.   Yes.
> Q.   Did he know she turned in an application for employment/
> ***
> A.   I think he was there, but I'm not sure that he was there when she brought it back.  But from our discussions, I assumed, yes, he knew she had turned in the application.
> Q.   Okay.  Can you explain for me again was it a conversation you had with Mr. Emmer?
> A.   It would have been him and Linda and I.
> Q.   And could you just describe for me that conversation?
> A.   Somebody made the comment, I'm thinking it was Linda, but I'm not real sure.  It could have been either one of them.  Why would she even want to work down here after what happened with [Plaintiff's husband]?  Well, I don't know.  I said, that does seem, you know, kind of odd.  I don't know why she would want to work here.
> Q.   And did Mr. Emmer say anything?
> A.   I don't remember.
> Q.   But he was there in the conversation?
> * * *
> A.   Yes, he was.

(Exh. H, Cagle Depo. at 26-27.)

After she turned in her application, Blalock testified she telephoned Bud Emmer again, this time to inform him that she had submitted her application. During this telephone conversation, Plaintiff claims that Emmer told her that the job was rough and nasty and that it was "too hard and too rough for a woman" and "that a woman couldn't handle doing that kind of job." (Exh. A, Blalock Depo. at 130-131.) After about a week, Blalock called Emmer again to check on the status of her application and he told her that he had hired a man for the job. (*Id.* at 133.) Emmer testified in his deposition that Randall Gibson was hired to fill the position in question. (Exh. N, Emmer Depo. 69.)

Richard Chilton, who was the general manager of Waste Industries' Ooltewah Branch from November 1997 through May of 2000 swore in his affidavit submitted by Waste Industries to the following:

> "Generally, when a truck driver position became available, the facility or operations manager would review the applications to determine if any of the applicants met our hiring criteria/requirements. The facility or operations manager also conducted initial interviews of applicants who satisfied our hiring criteria. I then interviewed any recommended candidates and made a final decision as to which applicant should be hired for the job."

(Exh. R, Def.'s MSJ- Chilton Aff. p. 6.) This statement was corroborated by Emmer, who testified as follows:

> | Page: | What about applications at Ooltewah, did you have any –after you became operations manager, did you have any– what were your responsibilities for positions that became open in Ooltewah? |
> | Emmer: | Basically the same that was in Stevenson. |
> | Page: | You conducted the initial interview? |
> | Emmer: | Yes. |

(Exh. N, Emmer Dep. 49.)

9

> Page:      Did I understand that you would recommend – you would make recommendations to Richard Chilton as to hiring decisions?
>
> Emmer:     Based on the initial interview, yes.

(Exh. N, Emmer Dep. 58.)  Emmer also testified in his deposition that during his time as either site supervisor or operations manager, he could "screen out" applicants during the initial interview process without being subject to review by Chilton, his superior.

> Page:      Did everyone who had an initial interview with you always get a second interview, or could you screen individuals out after the initial interview?
>
> Emmer:     The initial first interview, yes, I could screen them out.
>
> Page:      Okay. Did you have to get approval from Mr. Chilton to not call someone back for a second interview?
>
> Emmer:     No, no.

(Exh. N, Emmer Dep. 29.)

## II.    STANDARD OF REVIEW

Rule 56 provides that summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The procedure a district court in the Eleventh Circuit must follow in deciding a motion for summary judgment is set out in *Clark v. Coats & Clark*, 929 F.2d 604 (11th Cir. 1991):

> The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed an issue of material fact that precludes summary judgment.

(*Id*. at 608.)

"As the moving party, [the defendant] has the burden of showing the absence of a genuine issue of material fact, and for these purposes the material it lodged must be viewed in the light most

favorable to the opposing party." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986); *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 918 (11th Cir. 1993).   The district court cannot weigh conflicting evidence or make credibility determinations; instead, "'[the evidence] of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Hairston*, 9 F.3d at 919 (quoting *Anderson*, 477 U.S. at 255).

If the moving party carries this burden and shows the lack of a material question of fact and its entitlement to judgment as a matter of law, then -- and only then -- the party opposing the motion must show the existence of a genuine issue of material fact. *Hairston*, 9 F.3d at 918 (citing *Matsushita*, 475 U.S. at 586-87; *Coats & Clark*, 929 F.2d at 608).   The substantive law defines which facts are "material." *Anderson*, 477 U.S. at 248.   A factual dispute is "genuine" if "a reasonable jury could return a verdict for the non-movant," and there is "a real basis in the record" for the factual dispute. *Hairston*, 9 F.3d at 919 (citing *Anderson*, 477 U.S. at 248; *Matsushita*, 475 U.S. at 586-87)).

**III.   DISCUSSION**

   **A.   Blalock's Disparate Treatment Claim**

   **1.   Is There a Sufficient Showing of Direct Evidence to Avoid Summary Judgment?**

A plaintiff attempting to prove disparate treatment discrimination, may do so in one of two ways, "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *U.S.*

11

*Postal Service v. Aikens*, 460 U.S. 711, 714-715 (1983). "In cases of discrimination proven by direct evidence, it is incorrect to rely on the *McDonnell Douglas*[5] test because, while circumstantial evidence is used to create an inference of discrimination under *McDonnell Douglas*, no such inference of discrimination is required in the case of direct evidence." *Bass v. Board of County Commissioners, Orange County, Florida*, 256 F.3d 1095, 1104 (11th Cir. 2001)(citing *Taylor v. Runyon*, 175 f.3d 861, 867 n.2 (11th Cir. 1999).[6]

The term "direct evidence" in a sex discrimination case "does not refer to whether evidence is direct or circumstantial in the ordinary evidentiary sense in which we normally think of those terms." *Bass*, 256 F.3d at 1111.  The Eleventh Circuit recently clarified the definition of direct evidence in *Bass* when it opined:

> Direct evidence refers to a type of evidence which, if true, would require no inferential leap in order for a court to find discrimination. We do not believe that the status of evidence as "direct" in this context, however, changes simply because a defendant contests the validity of the evidence, thereby requiring the plaintiff to offer proof related to the disputed evidence through other means.

*Bass*, 256 F.3d at 1111.  The court in *Bass* went on to state that, "We have held that 'where the non-movant presents direct evidence that, *if believed by the jury*, would be sufficient to win at trial, summary judgment is not appropriate *even where the movant presents conflicting evidence.*'" *Id.* at 1112 (quoting *Mize v. Jefferson City Bd. Of Educ.,* 93 F.3d 739,742 (11th Cir. 1996)(emphasis

---

[5]The *McDonnell Douglas* test is used in cases "based on circumstantial evidence." *Bass v. Board of County Commissioners, Orange County, Florida*, 256 F.3d 1095, 1103 (11th Cir. 2001).

[6]*See also* EEOC v. Alton Packaging Company, 901 F.2d 920 (11th Cir. 1990); *Bell v. Birmingham Linen Service*, 715 F.2d 1552 (11th Cir. 1983); *Wright v. Southland Corporation*, 187 F.3d 1287 (11th Cir. 1999); *E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920 (11th Cir. 1990); *E.E.O.C. v. Beverage Canners, Inc.*, 897 F.2d 1067 (11th Cir. 1990); *Miles v. M.N.C. Corp.*, 750 F.2d 867 (11th Cir.1985); and *Wilson v. City of Aliceville*, 779 F.2d 631 (11th Cir. 1986).

added in *Bass*).

Plaintiff's initial argument is that Emmer's comments to her that the job was rough and nasty and that it was "too hard and too rough for a woman" and "that a woman couldn't handle doing that kind of job" constitute direct evidence of discrimination. (*See* Exh. A, Blalock Depo. at 130-131.) Of course, Plaintiff is correct. If made by a decision-maker, "a statement that members of a racial minority in general or women in general are simply not competent enough to do a particular job would seem to be a classic example of direct evidence." *Haynes v. W.C. Caye & Co., Inc.,* 52 F.3d 928, 931 (11th Cir. 1995). These statements are so blatant that, if believed by the trier of fact, they prove the existence of a fact in issue without any need for inference or presumption, thus constituting direct evidence.

Thus, the only arguable question related to these statements is whether Emmer was a decision-maker. *Trotter v. Board of Trustees of Univ. of Alabama,* 91 F.3d 1449, 1453-54 (11th Cir. 1996)(in order to constitute direct evidence such discriminatory statements or actions must be made by a person *involved* in the challenged decision.) Defendant argues that Chilton was *the* decision-maker in this case and therefore Emmer's statements cannot be deemed "direct evidence." While it is true that Chilton was the final decision-maker in the hiring process, he was not the only management member whose decisions affected applicants during the hiring process. "For statements of discriminatory intent to constitute direct evidence of discrimination they must be made by a person *involved* in the challenged decision." *Bass,* 256 F.3d at 1105(emphasis added); *see also Jones v. Gerwens,* 874 F.2d 1534, 1541 n.13 ("[D]isparate treatment analysis requires that *none* of the participants in the decision-making process be influenced by racial basis.")(emphasis added).

The Rule 56 record before the court, considered in the light most favorable to Plaintiff, presents substantial evidence that Emmer was a decision-maker.  As operations manager, Emmer was responsible for initial interviews at the Stevenson facility and was allowed to screen out applicants without review by his superiors. (Exh. N, Emmer Depo., 29.)  In fact, only the applicants who survived the screening process would be forwarded to Chilton by Emmer for a second interview. (Exh. R., Def.'s MSJ- Chilton Aff.; and Exh. N, Emmer Depo. at 29, 58.)  The record evidence also indicates Emmer had conversations with the Plaintiff regarding the open positions at Waste Industries wherein he made discriminatory comments.  For example, Plaintiff claims that she had two conversations with Emmer -- one before and one after she submitted her application. (Exh. A., Blalock Depo. at 130-31.)  In the first, she claims she told Emmer she would be submitting the application.  In the second, she claims she told Emmer that she had done so.  She also has sworn that Emmer told her the job was rough and nasty and that it was "too hard and too rough for a woman" and "that a woman couldn't handle doing that kind of job." (Exh. A, Blalock Depo. at 130-131.)

Emmer denies making these statements. (Exh. N. Emmer Depo. at 65.)  However, that is of no moment for this inquiry.  At the summary judgment stage, that cuts no ice at all.  The district court cannot resolve a factual dispute in favor of the moving party. *Lane v. Celotex Corp.,* 782 F.2d 1526, 1528 (11th Cir. 1986)("[T]he district court must not resolve factual disputes by weighing conflicting evidence, since it is the province of the jury to access the probative value of the evidence.")(internal citations and quotations omitted); *see also, Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir. 1997)("The nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole.  *The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.*")(internal citations and quotations

14

omitted)(emphasis added). (*See e.g.*, Exh. A, Blalock Depo. 13-31; Exh. N, Emmer Depo. 62-63.)

These alleged statements, coupled with Emmer's ability to "screen" applicants, *i.e.*, reject applicants, warrants the conclusion that there is substantial evidence that he was involved in the decision-making process. In other words, whether Emmer's actions are sufficient to find that he was a part of the decision-making process here is a question for the trier of fact. Accordingly, because there is substantial evidence that Emmer was a decision-maker and made comments that constitute direct evidence, summary judgment as to Plaintiff's disparate treatment claim is inappropriate for this reason alone.

> ### 2.    Is There Sufficient Circumstantial Evidence of Sex Discrimination to Avoid Summary Judgment?

Moreover, if there was not a showing of direct evidence in this case, Plaintiff is still entitled to present her case to a jury because she has presented sufficient circumstantial evidence of gender discrimination under the *McDonnell Douglas* framework.

"To evaluate Title VII claims based on circumstantial evidence, we use the familiar framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089 67 L.Ed.2d 207 (1981)." *Bass v. Board of County Commissioners, Orange County, Florida*, 256 F.3d 1095 (11th Cir. 2001).

The framework for such an analysis is as follows:

> [T]he plaintiff has initial burden of establishing a prima facie case of discrimination. If he meets that burden, then an inference arises that the challenged action was motivated by discriminatory intent. The burden then shifts to the employer to "articulate" a legitimate, non-discriminatory reason for its action. If the employer successfully articulates such a reason, then the burden shifts back to the plaintiff to show that the proffered reason is really pretext for unlawful

discrimination.

*Schoenfeld v. Babbitt,* 168 F.3d 1257, 1267 (11th Cir. 1999)(internal citations omitted).

### a.    Blalock's Prima Facie Case

The *McDonnell Douglas* framework was "never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 715 (1983)(quoting *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577 (1978)). Moreover, it is "the existence of a genuine issue of material fact, not existence or nonexistence of a prima facie case," that controls whether summary judgment is appropriate. *Thornbrough v. Columbus and Greenville R. Co.*, 760 F.2d 633, 641 n. 8 (5th Cir. 1985). It is important to bear in mind that "[t]he factual inquiry in a Title VII case is whether the defendant intentionally discriminated against the plaintiff." *Aikens*, 460 U.S. at 715 (citing *Burdine*, 450 U.S. at 253.).

Plaintiff can easily establish a prima facie case of discrimination. "In a traditional failure-to-hire case, the plaintiff establishes a prima facie case by demonstrating that: (1) she was a member of a protected class; (2) she applied and was qualified for a position for which the employer was accepting applications; (3) despite her qualifications, she was not hired; and (4) the position remained open or was filled by another person outside of her protected class." *E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1273 (11th Cir. 2002)(citing *Schoenfeld*, 168 F.3d at 1267). Viewing the record evidence in the light most favorable to her, Plaintiff has shown that, 1) she is a member of a protected class; 2) with respect to two positions at Waste Industries, Plaintiff was qualified for the position and she met all of the job criteria listed in the company's job description

for the position;[7] 3) despite her qualifications she was not hired[8]; and 4) one position was filed with a male, Randal Gibson,[9] and the other position remained open.

        **b.**    **Waste Industries' Burden of Production to Articulate a Legitimate, Non-Discriminatory Reason for Plaintiff's Non-selection**

"Once a plaintiff meets his burden of establishing a prima facie case, an inference of discrimination arises and the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for its hiring decision." *Schoenfeld*, 168 F.3d at 1268-1269(citing *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093). According to the Eleventh Circuit, "where a plaintiff's prima facie case is established, but the employer *fails* to meet its burden of production, the unrequited presumption of discrimination stands." *Turnes v. AmSouth Bank NA*, 36 F.3d 1057, 1061(11th Cir. 1994)(citing *Joshi v. Florida State Univ. Health Ctr.*, 763 F.2d 1227, 1236 (11th Cir. 1985))(emphasis in original). Such is not the case here. Defendant's articulated reason in this case appears to be that, "Mr. Chilton did not know that she had applied for the job." (Exh. R, Def.'s MSJ p.13.) The burden to articulate a non-discriminatory reason is one that is "exceedingly light." Therefore, the court finds that Defendant has met its burden and the question becomes whether Plaintiff can present substantial evidence that Defendant's reason is a pretext for sex discrimination.

---

[7](*See* Exh. O, Def.'s EEOC Responses for Job Description dated 3/21/1996 and Exh. M, Depo. Exh. 8.) Blalock does not have to argue that she was *more* qualified than the man who eventually received one of the positions in order to make out a prima facie case. The Eleventh Circuit held in *Walker v. Mortham*, 158 F.3d 1177 (11th Cir. 1998), that a plaintiff is not required to show that she is equally or more qualified than the successful applicant as part of her initial burden to establish a prima facie case of discrimination. The Eleventh Circuit has repeatedly affirmed that a "disparities of qualification" analysis arises only in rebuttal to a defendant's assertion that the successful candidate was chosen for the nondiscriminatory reason that she was the better qualified candidate. *See Denny v. City of Albany*, 247 F.3d 1172, 1187 (11th Cir. 2001).

[8](*See* Exh. R, Def.'s MSJ p.12 "Waste Industries does not dispute ... that she was not hired for the position....")

[9](*See* Exh. N, Emmer Depo. p. 69.)

c.     **Blalock's Burden to Demonstrate that Defendant's Proffered Reason Is Pretextual**

Under the *McDonnell-Douglas* test, after the defendant proffers its legitimate, non-discriminatory reason for the challenged employment decision, "[the plaintiff] must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981). "A plaintiff may show pretext and survive summary judgment by 'presenting evidence sufficient to demonstrate a genuine issue of material fact as to the truth or falsity of the employer's legitimate, non-discriminatory reasons.'"*Schoenfeld v. Babbitt*, 168 F.3d 1257, 1269(11th Cir. 1999)(quoting *Evans v. McClain of Geogia, Inc.*, 131 F.3d 957, 965 (11th Cir. 1997)(citations omitted)); *see St. Mary's Honor Center v. Hicks*, 509 U.S.502, 511 (1993)("The fact finder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of a prima facie case, suffice to show intentional discrimination.").

Simply stated, for reasons already discussed above, Plaintiff has put forth substantial evidence that raises genuine issues about whether Defendant's proffered reason for the Plaintiff's non-selection is the true reason she was not hired. "Once a plaintiff has established a prima facie case and has put on sufficient evidence to allow a factfinder to disbelieve an employer's proffered explanation for its actions, that alone is enough to preclude entry of judgment as a matter of law." *Combs v. Plantation Patterns, Inc.*, 106 F.3d 1519, 1532 (11th Cir. 1997).

First, Plaintiff has submitted substantial evidence that Emmer made discriminatory statements directly to her.[10] ( *See e.g.*, pp. 8-9, 13, 14 *supra*.) Second, Plaintiff has also submitted

_____

[10]Even if Emmer's "rough and nasty" comments do not fit under the umbrella of "direct evidence," they certainly are evidence of pretext that the reason articulated by Waste Industries may not be the real reason it did not hire Plaintiff. The "[u]se of racial aspersions obviously provides an indication that the speaker might be more likely to take race into

evidence that Emmer manufactured a portion of the job criteria (*i.e.*, the 100 lb. lifting requirement). Although neither the 1996 nor the 1999 job descriptions for Residential Driver anywhere impose the requirement that an applicant must be able to lift 100 pounds, Emmer, who had the authority to screen out applicants, testified that he imposed his own criteria and required that Residential Drivers be able to lift 100 pounds. (Exh. N, Emmer Depo. at 43-46.) When asked who told him that being able to lift a hundred pounds was a requirement for the driver position he replied "I set it." (Exh. N, Emmer Depo. at 45.)

Lowry, Waste Industries Human Resources manager, testified that the job description for Residential Driver applied across the company regardless of branch location and the qualifications set by corporate HR as reflected in the job description were to be followed by the branches:

> Q. And there is criteria in this job description [referring to Exhibit 8] for qualifications that a truck driver must have to be hired?
> A. Yes, sir. Yes, sir, it is.
> Q. And does the branch manager have the discretion to ignore the criteria that's in this job description?
> A. No, sir, he does not.

(Exh. J, Lowry Depo. at 176.) Regarding the 100-pound lifting requirement, Emmer testified:

> Q. Did Mr. Chilton have any say in whether [the 100-pound lifting requirement] was a qualification?
> A. Not to my knowledge, no.
> Q. Did you have that hundred pound lifting requirement approved by the corporate headquarters?
> A. No.
> Q. How did you know if an individual applying for a driver position could lift a hundred pounds?
> A. For the most part you could tell by looking at someone, and also they took a physical.
> Q. Was part of that physical lifting a hundred pounds?

---

account in making a . . . decision." *Mullen v. Princess Anne Volunteer Fire Co.*, 853 F.2d 1130, 1133 (4th Cir. 1988)("Where a plaintiff seeks to prove discriminatory intent, the probative value of statements revealing the racial attitudes of the decision-maker is great.")

A.    I don't think so, no.  I don't think they lifted a hundred pounds in the physical, no.

Q.    What would somebody look like that could lift a hundred pounds?

A.    I wouldn't know.

                        * * *

Q.    . . . You said that you could tell who could lift a hundred pounds by looking at them.

A.    I don't believe someone weighing 90 pounds could lift up a hundred pounds, no.

Q.    What about somebody withing 120 pounds?

A.    That's a possibility, yes.

Q.    But you didn't have anyone do a – lift a hundred pounds for you as part of the interview process?

A.    No.

(Exh. N, Emmer Depo. at 46-47.)

In this case, Plaintiff has presented substantial evidence that Defendant had a written set of qualifications for job openings, but that Emmer violated company policy and disregarded those written qualifications in a manner that may have tended to disadvantage a female applicant for the position. Evidence of this nature can establish pretext. *See e.g., Bass v. Bd. Of County Commissioners,* 256 F.3d 1095, 1108 (11th Cir. 2001)(finding that where a defendant violated a written procedure in the context of awarding a promotion there was evidence of pretext).

For all of the aforementioned reasons, the Plaintiff has successfully demonstrated that there are genuine issues of material fact regarding her disparate treatment claim and that Defendant is *not* entitled to judgment as a matter of law on that claim.

**B.    Blalock's Disparate Impact Claim**

**1.    Plaintiff's Burden to Establish a Prima Facie Case of Disparate Impact.**

Plaintiff also claims that Defendant's hiring policies had a disparate impact on her[11] in

---

[11]Plaintiff originally advanced a disparate impact claim on behalf of putative class members.  However, her class claims were dismissed by The Honorable C. Lynwood Smith, Jr. because, owing to her failure to identify any other female applicants who were adversely affected by the Defendant's selection procedures, she could not satisfy the

violation of Title VII.  The disparate impact "theory prohibits *neutral* employment practices which while non-discriminatory on their face, visit an adverse, disproportionate impact on a statutorily protected group." *E.E.O.C. v. Joe's Stone Crab, Inc.,* 220 F.3d 1263, 1274 (11th Cir. 2000). "The doctrine seeks the removal of employment obstacles, not required by business necessity, which create 'built-in headwinds' and freeze out protected groups from job opportunities and advancement." *Id.* (*quoting Griffin v. Carlin*, 755 F.2d 1516, 1524(11th Cir. 1985)(quoting *Griggs v. Duke Power Co.,* 401 U.S. 424, 431-32(1971)).

"A disparate impact claim requires the identification of a specific, facially neutral, employment practice causally responsible for an identified statistical disparity."*Joe's Stone Crab,* 220 F.3d at 1274.  The disparate impact analysis has been applied to individual plaintiffs as well as class actions.  *Craig v. Alabama State University*, 804 F.2d 682, 686 (11th Cir. 1986)(noting that, in *Connecticut v. Teal,* 457 U.S. 440, 455-56 (1982), the U.S. Supreme Court observed "every *individual* employee is protected against discriminatory treatment *and* neutral practices that are discriminatory in operation."(emphasis in original)).

A plaintiff seeking to prove discrimination through the disparate impact theory must establish three elements: "*first*, that there is a significant statistical disparity between the proportion of women in the available labor pool and the proportion of women hired; *second*, that there is a specific, facially-neutral, employment practice which is the alleged cause of the disparity; and*finally* ... that a causal nexus exists between the specific employment practice identified and the statistical disparity shown." *Joe's Stone Crab,* 220 F.3d at 1274. "Once each of these three elements are shown, a plaintiff has established a prima facie case of disparate impact discrimination. The burden

---

numerosity requirement of Rule 23(a)(4).

of production then shifts to the defendant to establish that the challenged employment practice serves a legitimate, non-discriminatory business objective. However, even if the defendant satisfies this burden, a plaintiff may still prevail by proving that an alternative, non-discriminatory practice would have served the defendant's stated objective equally as well." *Id.* at 1275. (citations omitted).

### 2.   Blalock Has Not Established a Prima Facie Case of Disparate Impact.

Plaintiff has not shown that a facially neutral employment practice was causally connected to any statistical disparity in this case.[12] Even more importantly, Plaintiff has not shown that *she* was adversely affected by any neutral employment practice.

Plaintiff challenges two different policies or practices under the disparate impact model: (1) Defendant's alleged use of word-of-mouth recruitment of applicants; and (2) Defendant's alleged failure to review the screening of initial applicants by hiring managers (such as Emmer) that permitted managers to use subjective hiring criteria. "The Supreme Court has explained that '[u]nder the act, practices, procedures, or tests *neutral on their face, and even neutral in terms of intent,* cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices.'" *Joe's Stone Crab*, 220 F.3d at 1278 (emphasis added). In this case, however, Plaintiff has utterly failed to present substantial evidence that either of the alleged policies or practices caused an adverse disparate impact on females.

First, Plaintiff has not shown that Waste Industries stated policy of internal word-of-mouth hiring has any causal nexus to any adverse effect on Plaintiff. *See E.E.O.C. v. Joe's Stone Crab, Inc.,* 220 F.3d 1263, 1274 (11th Cir. 2000). In *Joe's Stone Crab*, the Eleventh Circuit vacated the

---

[12] As Plaintiff is no longer a potential class representative, and now relegated to pursue her own claim of disparate impact, the statistical analysis is only important if she herself was adversely affected by the neutral practices in question. As explained below, she was not. Accordingly, she simply has no standing to assert such claims.

district court's finding that the plaintiff had established a disparate impact claim after evaluating the two grounds advanced by the E.E.O.C. upon which they intended to base a disparate impact claim, one of which was word-of-mouth hiring. *Joe's Stone Crab*, 220 F.3d at 1278. The Eleventh Circuit held that there was no connection because it was not a "case where Joe's formal recruiting practices or informal word-of -mouth recruiting network kept women from learning about available jobs at Joe's." *Id.* at 1279. The same is true here. Despite Waste Management's stated policy of internal word-of-mouth hiring, there is no question that Plaintiff was aware of openings and, according to her own testimony, applied for positions which became open at the company. Thus, even if (as Plaintiff contends) the policy of an internal word-of-mouth hiring preference operated as "a built-in headwind" by freezing out women because they were not already employed with Waste Industries, this had no disparate impact on Plaintiff's opportunity to apply for the job in question. She actually applied. She was not hired.

Second, Plaintiff's assertion that she was adversely affected by the Defendant's delegation and non-review of initial applicants screening responsibilities fails, as well, but for a different reason. Plaintiff's assertion is really not suited to a disparate impact analysis because her complaint is that Waste Industries granted discretion to Emmer and that he exercised his discretion to intentionally discriminate against Plaintiff. That is, Plaintiff asserts that Emmer employed a *purposeful* discriminatory policy in not forwarding her application on to his superior, *not* a *neutral* one that happened to result in discrimination once applied. Essentially, her contention is that Emmer was given the responsibility of screening applicants, which allowed him to exercise his discretion to discriminate. Although Plaintiff can present that theory to a trier of fact based upon a disparate treatment model, she cannot assert such a claim under a disparate impact theory because she simply

23

has not sufficiently identified a particular neutral employment practice that inadvertently causes such an impact. *See* 42 U.S.C. § 2000e-2(k). At best, Plaintiff has shown how a manager (Emmer) intentionally applies a neutral practice to discriminate. That intentional act of a supervisor with discretion is simply not a particular employment practice capable of evaluation for impact.[13]

## IV.   **CONCLUSION**

For the reasons stated above, Defendant's motion for summary judgment is due to be granted in part and denied in part. Plaintiff's disparate impact claim is dismissed with prejudice because Defendant has demonstrated that there are no disputed issues of material fact related to that claim and that it is entitled to judgment as a matter of law on it. However, Defendant's motion for summary judgment related to Plaintiff's disparate treatment claim is due to be denied. A separate order shall be issued contemporaneously herewith.

**DONE** and **ORDERED** this __17th__ day of March, 2004.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

---

[13]Moreover, to the extent Plaintiff is claiming that the mere usage of "subjective hiring criteria" results in a disparate impact, this claim fails as a matter of law as well. The Eleventh Circuit has made clear that a subjective reason can be legally sufficient if the defendant articulates a clear factual basis for the opinion. *Chapman v. AI Transport*, 229 F.3d 1012, 1034 (11th Cir. 2000) (*en banc*). Although *Chapman* was a disparate treatment case, the analysis applies to an impact claim to the extent it suggests that the mere use of subjective reasons for a decision cannot uniformly cause a discriminatory impact.

24